UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br> v.<br><br>THOMAS DALE OVERSTREET,<br><br>     Defendant. | Case No. 1:11-cr-00207-BLW<br><br>**FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW** |

## INTRODUCTION

On September 19 and 20, 2012, the Court conducted a two-day evidentiary hearing regarding forfeiture. The parties then submitted their briefs and proposed findings of fact and conclusions of law. The Court now issues its findings and conclusions.

The Court notes as an initial matter that the bulk of the Court's findings of fact and conclusions of law are adopted from the Government's proposed findings and conclusions because they accurately reflect the Court's findings and conclusions, and because the defendant had very limited objections. The defendant objected to only a few statements of fact as either unsupported by the evidence, inaccurate or irrelevant. The Court considered these objections in making its own findings and conclusions.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 1**

# BACKGROUND

1.      On August 24, 2012, the defendant pled guilty to Counts One, Five and Six of the Superseding Indictment.

2.      In making the following findings pertaining to forfeiture, the Court has considered the factual basis for the defendant's guilty plea, as well as the defendant's statements in response to questions by Magistrate Judge Boyle, who conducted the actual plea colloquy.

3.      During the forfeiture hearing, the Court had an opportunity to review the exhibits admitted into evidence, hear witness testimony, and observe the demeanor of testifying witnesses.

4.      The Court has also considered the joint stipulations filed by the parties on September 19, 2012. Dkt. 80.

5.      The Court heard testimony from six fact witnesses: Kelly Dart, Tina Youngblood, Sandra Hendry, Courtney Zitelli, Miel Snowball, and Dave Parker.

6.      The Court also heard testimony from a summary expert witness, Linda Czymeres.

7.      Except as otherwise noted below, the Court found the testimony of these witnesses credible.

8.      The bulk of the findings of fact are based upon the testimony from these individuals.

9.     The Court also reviewed a video and accompanying audio recording of a meeting between the defendant and an undercover agent with the Criminal Investigation division of the Internal Revenue Service (IRS-CI), in which the agent posed as a prospective buyer of Club 7.

10.    During the forfeiture hearing, the Court listened to portions of jailhouse audio recordings made of the defendant's phone calls and jailhouse visits with friends and associates of the defendant.

## FINDINGS OF FACT

Based on the defendant's change of plea hearing and the forfeiture hearing, the Court finds that the government has proved the following facts by a preponderance of evidence.

1.     From approximately 2001 through June 2011, the defendant was the sole owner and operator of Club 7, a business in Fruitland, Idaho.

2.     Club 7, which has since closed, was a bar located at 210 SW 3rd Street.

3.     The defendant received income from the sale of goods and services at Club 7, as well as the illegal gambling business he ran out of Club 7.

4.     Aside from the sale of goods and services at Club 7, and his illegal gambling business, the defendant had no other sources of income during that time period.

5.     The illegal gambling business was located in Club 7 and involved the management and operation of electronic video gambling machines.

6.      The games on these machines were games of chance.

7.      To play the machines, customers paid cash into the machines using automatic bill feeders.

8.      In violation of Idaho state law, employees of Club 7 made cash pay-outs to customers who won on the machines.

9.      The defendant directed his employees and associates to make the cash pay-outs, all the while knowing that such pay-outs were illegal under Idaho state law.

10.     The defendant received all profits from the illegal gambling business, of which he was the manager and owner.

11.     To track the pay-outs made to customers, the defendant required his employees to keep daily records, often on a post-it or small sheet of paper, about each pay-out, including the time, machine number, customer name, credit reading on the machine, and cash paid out.

12.     The defendant then compared these daily pay-out slips to the readings off meters installed on the machines, which tracked the amount of cash paid in by customers and the cash pay-outs.

13.     On approximately a weekly basis, the defendant would use the meter readings to compute the profits from the illegal gambling business.

14.     The IRS used the ledgers kept by the defendant, as well as the meter readings recorded on the bank of shift envelopes, to determine the total gross receipts and profits from the defendant's illegal gambling business.

15.     Between mid-2003 and 2010, the defendant had gross receipts of at least $2,411,467.60 from his illegal gambling operation and made pay-outs of $1,397,699.50.

16.     The defendant's profits from his illegal gambling business were $1,013,768.10. Gov't Ex. 7-1.

17.     At times, associates of the defendant would assist with the management of the illegal gambling business, such as by removing the money from the machines, counting it, and reading the meters.

18.     The meter readings from the machines were recorded in ledgers maintained by the defendant.

19.     The defendant would reconcile the ledgers with the daily pay-out slips prepared by the Club 7 employees.

20.     The defendant typically disposed of these gambling slips after performing the reconciliation.

21.     Except when he was out of town, the defendant also oversaw the weekly removal and counting of cash from the gambling machines.

22.  In his absence, the defendant would instruct his associates to remove and count the cash.

23.  The defendant kept equally detailed records of the legal sales and expenses associated with Club 7, the gross receipts of which primarily consisted of food and alcohol sales.

24.  At the defendant's direction, Club 7 generally required customers to pay cash for goods and services.

25.  The defendant permitted a few patrons to pay with personal check; however, even in those cases the customers wrote checks made out to Club 7, which were then cashed by the bartender.

26.  The customer would then use the cash to pay for purchases or gambling.

27.  Each of the Club 7 bartenders was responsible for maintaining and accounting for payments into and out of her weekly cash register till.

28.  At the end of each shift, the bartender would fill out a daily till sheet and envelope, on which the bartender performed a basic reconciliation, showing the cash paid in and out during that shift.

29.  Until the defendant received a citation for illegal gambling in August 2005, the bartenders would record cash pay-outs for the illegal gambling business made from their cash register till on this paperwork.

30.     The bartenders would also include the gambling payout sheet showing the cash pay-outs made during their shift, thereby accounting for the till's shortfall caused by the gambling pay-outs.

31.     The defendant abandoned this accounting system after the Attorney General's Office for the State of Idaho sought to suspend Club 7's liquor license based on the defendant's illegal gambling business.

32.     In that action, the defendant was charged with violating Title 23, Section 928(2) of the Alcohol Beverage Code by allowing gambling and gambling pay-offs to occur in Club 7.

33.     The case was resolved with a fine and stipulation, in which the defendant admitted to allowing gambling activities to take place at Club 7, in violation of Idaho Code 23-928.

34.     Pursuant to the agreement, the defendant paid a fine of $3,000 to Alcohol Beverage Control.

35.     Although the defendant paid a fine for his illegal gambling business, he did not take the machines out of Club 7, nor did he stop making cash pay-outs.

36.     Even while the administrative proceeding was pending, the illegal gambling business continued at the defendant's direction.

37.     The defendant changed his procedures to reduce the visibility of the illegal gambling business, particularly the cash pay-outs.

38.　　These measures included additional scrutiny of customers who wanted to gamble, creation of a back room that housed most of the electronic video gambling machines and required a key for access, a new system for tracking gambling pay-outs, and destruction of pay-out records after compilation and review by the defendant.

39.　　At the defendant's direction, the bartenders no longer put the daily pay-out slips tracking gambling pay-outs with their shift envelopes.

40.　　Rather, bartenders were instructed to keep the daily pay-out slip on their person, and then pass the daily payout slip to the next bartender at the end of the shift.

41.　　Because gambling pay-outs were made from the bartender's cash register till, the defendant directed his employees to erase the shortfall created by the pay-outs at the end of each shift by having the incoming bartender provide money from her till equal to the amount of cash pay-outs shown on the daily pay-out slip.

42.　　As a result, the outgoing bartender's till would reconcile with the amount of food and alcohol sales, thus making it appear that no gambling pay-outs had been made.

43.　　At the end of the evening, the defendant or one of his associates would reimburse the bartender working the last shift for the total amount of gambling pay-outs made over the course of that day.

44.     On an approximately weekly basis, the defendant and his associates would count the cash proceeds from the illegal gambling business and the sale of goods and services at Club 7.

45.     The money was collected and counted in the bar, or the defendant's personal residence in Club 7.

46.     At the defendant's direction, the cash proceeds from the illegal gambling business would then be combined with the legal-source proceeds from Club 7, and then used to make up the new cash register tills used by Club 7 bartenders.

47.     Some of the cash would be separated out and earmarked for immediate or future restocking of the ATM in Club 7.

48.     Any remaining cash would be placed in the safe in the defendant's personal residence, which was located above the bar.

49.     The cash in these new "tills" would be used by the bartenders during the upcoming week for food and alcohol sales, gambling pay-outs, and check cashing.

50.     The evidence shows that the defendant knew about the relative profitability (or lack thereof) associated with the food, alcohol and legal entertainment sales at Club 7, along with the illegal gambling business.

51.     By using the defendant's records, including expense receipts that the defendant sorted and maintained in separate manila envelopes by month, the IRS

reconstructed the cash flow and profits of the defendant's legal and illegal businesses.

52. These calculations show that while the bar generated significant gross receipts, it also had significant overhead.

53. The illegal gambling business, in contrast, had no overhead aside from the cost of cash pay-outs on customer winnings.

54. For each of the years at issue, the evidence shows that the defendant's profits came overwhelmingly, if not entirely, from his illegal gambling business.

55. Even in the bar's more profitable years, the illegal source profits from gambling exceeded any bar profits by almost a 2:1 ratio.

56. The IRS calculations are consistent with profit/loss calculations that the defendant prepared for Club 7 and his illegal gambling business.

57. Profit and loss calculations prepared by the defendant were provided to a company called Affiliated Business Consultants ("ABC"), which the defendant hired to help him sell Club 7.

58. On those handwritten statements, the defendant's calculations show that his profits are primarily from his illegal gambling business.

59. More recently, when speaking to his girlfriend after his arrest in this case, the defendant noted that without the illegal gambling business, Club 7 was not

profitable and would be forced to close: "without the machines, it's just a slow downhill ride . . . without the machines, it [Club 7] don't make no money."

60.    The Court finds that the defendant knew throughout the period in question that his gambling business was profitable, and that without it Club 7 would – at best – break even.

61.    The profitability of the two ventures matters because it is probative of the defendant's purpose and rationale for his other business practices, namely, the check cashing service and automated teller machine (ATM) that defendant set up and operated at Club 7.

62.    Throughout the period in question, the defendant had one business checking account for Club 7.

63.    Despite operating an essentially all-cash business, the defendant deposited almost no cash into the Club 7 bank account: Between 2004 and 2011, $4,738,395.48 was deposited into the Club 7 bank account.

64.    Of the more than $4.73 million in deposits, only $25,520.21 – less than 0.53% – were cash deposits.

65.    In some years, including 2005, 2006 and 2009, there were no cash deposits.

66.    When an undercover agent met with the defendant in April 2011, the defendant admitted that he avoided depositing cash so as to avoid the federal reporting requirements for currency transactions.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 11**

67. The defendant nonetheless used the Club 7 bank account for almost all business transactions associated with the bar; almost no expenses were paid in cash.

68. Rather, employees and vendors were paid by checks written on the Club 7 bank account.

69. The defendant was able to avoid making cash deposits because of the check cashing service and ATM that he made available at Club 7.

70. At the defendant's direction, employees of Club 7 routinely exchanged cash from their cash register tills for third-party checks.

71. The cash used in these transactions included proceeds from the illegal gambling business.

72. The third-party checks were placed in the bartender's cash register tills, and then deposited into the Club 7 bank account on a weekly or semi-weekly basis by the defendant or his associates.

73. The defendant did not charge a fee for this service; nor did he require that the individuals who had their checks cashed purchase or patronize Club 7.

74. While the precise amount varied, on average Club 7 employees exchanged $20,000 to $30,000 cash for third-party checks every month. In some months, the amount of cashed checks was as high as $40,000 to $50,000. Gov't Ex. 7-4.

75.     Similarly, more than half of all deposits into the Club 7 checking account were third-party checks; most of the remaining deposits were associated with the ATM in Club 7.

76.     In 2004, the defendant and his girlfriend at the time, Tina Youngblood, purchased an ATM at a trade show in Las Vegas.

77.     The defendant decided not to charge a fee for using his ATM, nor did he require individuals who used it to purchase any goods or services from Club 7.

78.     Unlike some business owners, who pay a bank or company to supply the cash loaded into and withdrawn from the ATM, the defendant supplied his own cash.

79.     This cash came from Club 7 and the illegal gambling business, either directly from the electronic video gambling machines and bartender's cash register tills, or from the Club 7 bank account.

80.     When a patron would withdraw money from the defendant's ATM, the ATM servicing company would initiate an electronic fund transfer ("EFT") between the patron's bank account and the defendant's bank account.

81.     On the bank statements, the EFT appears as a withdrawal from the patron's bank account, and a deposit into the defendant's bank account.

82.     The amount of the withdrawal and deposit equal the amount of cash that the patron withdrew from the ATM in Club 7.

83.    All of the EFTs associated with the ATM went into the Club 7 business checking account.

84.    As with the check cashing service, many people used the defendant's no-fee ATM.

85.    While the precise amount varied, patrons withdrew an average $10,000 to $20,000 from the ATM every month.

86.    While the precise mechanics differed slightly, the check cashing and ATM transactions both enabled the defendant to transform his cash receipts into non-cash bank deposits.

87.    Unlike cash deposits, these forms of deposits were not subject to federal transaction reporting requirements.

88.    Through his check cashing operation and ATM, the defendant was able move the commingled proceeds of his illegal gambling business and Club 7 into a bank account, without the reporting requirements that would have been triggered by currency deposits of the same amount.

89.    Because the defendant was trying to conceal his illegal gambling business, as well as the nature and extent of the profits he was making from it, he did not want reports filed on his financial transactions.

90.    From talking to bank employees, the defendant knew what types of transactions were reported.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 14**

91. The ATM and check cashing service are two of the ways in which the defendant was able to avoid these reporting requirements.

92. While the defendant admitted sufficient facts at the change of plea hearing to support a guilty plea to Count Six, conspiracy to launder monetary instruments, there was no agreement between the defendant and the government as to the full scope, nature, or extent of the conspiracy.

93. The metes and bounds of the conspiracy matter for forfeiture because they implicate the proper amount of any money judgment, as well as the existence (or lack thereof) of a nexus between any real property and the money laundering conspiracy.

94. During his change of plea hearing, the defendant admitted that he agreed with at least one other person to engage in financial transactions involving the proceeds of his illegal gambling business, knowing that the transactions were designed at least in part to avoid a transaction reporting requirement, in violation of 18 U.S.C. § 1956(a)(1)(B)(ii).

95. The defendant further admitted that these financial transactions included the exchange of cash proceeds from the illegal gambling business for third-party checks that members of the public brought to Club 7 to be cashed.

96. Rule 32.2 of the Federal Rules of Criminal Procedure makes clear that the defendant may not tie the government's hands at forfeiture simply by limiting the factual basis underlying his guilty plea.

97. Here, the government put forth additional evidence regarding the conspiracy during the forfeiture hearing.

98. Based on the evidence presented during the forfeiture hearing, the Court finds that the scope and extent of the conspiracy was broader than delineated by the defendant's guilty plea.

99. In addition to the check cashing, the Court finds that the ATM in Club 7 was designed at least in part to avoid a transaction reporting requirement, in violation of 18 U.S.C. § 1956(a)(1)(B)(ii).

100. The evidence shows that the defendant and his associates engaged in financial transactions whereby cash proceeds from the illegal gambling business were exchanged via the ATM for EFTs into the Club 7 business checking account.

101. The defendant owned the ATM and controlled the bank account into which EFTs were deposited.

102. His associates assisted by reloading the ATM with illegal gambling proceeds, knowing the source of the money being loaded into the ATM as well as the effect of withdrawals from the ATM.

103.     In addition to conspiring to avoid transaction reporting requirements, the Court finds that the defendant and others conspired to conduct financial transactions with the illegal gambling proceeds, which were designed at least in part to promote the illegal gambling business, in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

104.     These financial transactions included the payment of expenses associated with the sale of food, alcohol and legal entertainment at Club 7, including the dart and pool tournaments.

105.     The defendant and his managers wrote checks to pay food and alcohol vendors, as well as the employees of Club 7.

106.     While the defendant could have closed the bar and continued to run an illegal gambling business, the bar facilitated or, in the words of the statute, "promoted," the illegal gambling business in numerous ways.

107.     At the most basic level, the bar provided a venue for the electronic video gambling machines, and its employees assisted with the operation and cash pay-outs on the machines.

108.     While some customers came just to gamble, many of these individuals also availed themselves of the food and alcohol sold at Club 7, or partook in the tournaments and contests put on by the defendant.

109.    As the defendant explained to the undercover agent, many of the contests and tournaments were not themselves moneymakers; rather, they were designed to get people into the bar where they could gamble.

110.    Just as importantly for the defendant, the all-cash bar enabled the defendant to conceal and disguise the true nature and source of his proceeds and profits.

111.    Although the defendant's records and IRS calculations show that the majority of the profits came from the defendant's illegal gambling business, the policies instituted and enforced by the defendant and his associates made it appear that all of the proceeds were from the bar, primarily the sale of food and alcohol.

112.    As the revenue agent and government expert both explained, the ATM and check cashing transactions enabled the defendant to move cash into the Club 7 business checking account, while disguising the true nature and source of those deposits.

113.    On their face, neither the EFTs nor the third-party checks could be categorized as income, let alone profits derived from, at least in part, an illegal gambling business.

114.    Further, because both the ATM and check cashing transactions involved an exchange, not a sale, no one looking at the Club 7 bank statements could know what underlying enterprises the defendant was engaged in, if any.

115.    The Court finds that the defendant and others conspired to conduct the check cashing and ATM financial transactions at least in part to conceal the true nature

and source of the proceeds from the defendant's illegal gambling business, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

116. The ATM and check cashing services at Club 7 describe, at least in part, how the money laundering conspiracy worked.

117. Between March 2004 and July 2011, $1,610,899.00 in EFTs associated with the ATM were deposited into the Club 7 bank account.

118. As described above, each of these EFTs corresponded to withdrawals of cash in Club 7.

119. During that same time period, the $3,074,159.24 in third-party checks was deposited into the Club 7 business checking account.

120. Each of these checks was signed over to Club 7 in exchange for cash.

121. All of this cash consisted of commingled proceeds from the illegal gambling business and bar. Gov't Ex. 7-4.

122. The ATM and check cashing transactions, however, are not the end of the story or the conspiracy.

123. Before the defendant became the owner and manager of Club 7, he purchased a piece of land in Mexico in or about 1994.

124. The property, which has its own private beach or lies next to a private beach, is located on the Baja California peninsula, near the town of La Ventana, in Baja California Sur.

125. While that area has grown significantly in recent years and become a popular vacation spot, at the time the defendant contracted to buy the property, the region was largely undeveloped.

126. The plot of land that the defendant bought was a bare, one-acre lot.

127. The lot was carved out of a larger piece being sold by a Mexican named YoYo, who had originally been in negotiations to sell the entire two-acre plot to a man named Courtney Zitelli.

128. The defendant approached Zitelli about purchasing a portion of the plot; Zitelli, who planned to build a personal residence on his portion, agreed.

129. Pursuant to the joint sales contract, YoYo's father sold Zitelli and the defendant adjoining, one-acre lots of beachfront property for approximately $25,000 U.S. dollars each.

130. Although Mexican law allows beachfront property to be sold to foreigners, it does not allow foreigners to hold title in their name.

131. Foreigners can, however, own beachfront property through a Mexican corporation, or a fideo comiso.

132. Zitelli, who is a U.S. citizen, opted to hold his portion as a fideo comiso, which Zitelli described as a long-term lease where the title itself is held in trust by a Mexican bank.

133. The defendant, who is also a U.S. citizen, chose to place the property in his name, as the father and guardian of his then-minor son, Dalaney Overstreet.

134. At the time, Dalaney Overstreet was three years old.

135. The defendant placed his son's name on the title to the Mexican property because Dalaney is a Mexican citizen, another decision that can be traced to the defendant.

136. Before purchasing the property with Zitelli, the defendant had spent significant time living in Baja California, even running an unsuccessful pizza business.

137. The defendant told Zitelli that putting the property in Dalaney's name meant he could essentially do what he pleased, because Mexican citizens were not subject to the same restrictions as foreigners.

138. According to the defendant, Dalaney's name on the title meant that no taxes had to be paid to the Mexican government.

139. Zitelli testified that this assertion surprised him, because as far as he knew, every property owner in Mexico had to pay taxes, regardless of citizenship.

140. While Dalaney was an occasional visitor to the Mexican property during his childhood, there is no question that the defendant was the decisionmaker: Receipts are made out to the defendant or his associates; the utilities and water bills are similarly in the defendant's name.

141. On a May 26, 2004, loan application, the defendant listed the Mexican property and listed himself as the owner. Gov't Ex. 1-13.

142.  Beginning on or about 2002, the defendant began making significant improvements to the bare lot.

143.  Records recovered during the search warrant show that the defendant hired an architect, commissioned building plans, and began construction of a multi-story restaurant and resort, which is now known as the Flying High Resort.

144.  The Flying High Resort includes an open-air restaurant and bar, as well as several rooms that can be rented by guests.

145.  The resort became operational in or about November 2011.

146.  Whatever may be the property interests of third parties, the Court finds that the defendant's representations of himself as the owner of the Flying High Resort accurately reflect who controlled, financed, and managed the property since its acquisition in or about 1995.

147.  Dalaney, while his name may appear on the title, has never been in a financial position to support the improvements made to the property.

148.  For much of the resort's history, Dalaney was a minor who resided in the United States where he attended school, graduating from high school in 2010.

149.  Based on Dalaney's age and witness testimony regarding his infrequent visits to Mexico prior to 2011, Dalaney did not have the ability or capacity to develop real estate in Mexico.

150.    The defendant, by his own admission in conversation with his sister during a prison call, has spent much of his life transforming the one-acre bare lot into a beachfront resort.

151.    Although the defendant traveled to Mexico several times a year for vacation and to oversee progress on the Flying High Resort, he was not personally responsible for its construction.

152.    Rather, the defendant relied on local Mexican labor, as evidenced by logs detailing hours worked and invoices for work completed.

153.    Most of the year, however, the defendant was busy overseeing and managing Club 7 and his illegal gambling business in Fruitland, Idaho.

154.    The defendant accordingly relied upon his associates, including Jerry Petras and Youngblood, to watch over and manage his affairs in Mexico.

155.    This assistance included the transportation of U.S. currency from the United States to Mexico at the defendant's direction.

156.    Youngblood testified that she routinely received $10,000 in U.S. currency at Overstreet's personal residence in Fruitland, Idaho, with instructions to take the money to his property in La Ventana, Mexico, and spend it on expenses associated with the resort's construction.

157. The money that the defendant gave to Youngblood generally came from the safe in the defendant's personal residence, which is where the defendant stored the commingled receipts from Club 7 and the illegal gambling business.

158. Youngblood was instructed not to declare the currency; to avoid federal currency reporting requirements, the defendant always gave her $10,000 so that she would have less than that amount by the time she reached the border, after paying for gas and travel expenses.

159. In addition to Youngblood, the defendant personally carried U.S. currency across the border to Mexico.

160. Before some trips to Mexico, the defendant would sometimes call his bank to request fresh, unmarked $100 bills in U.S. currency.

161. The manager at the time, Dart, recalled several instances when the defendant called and made this request.

162. In some instances, the withdrawals were written as checks to "cash," others were counter withdrawal slips.

163. In addition to the defendant and his associates physically transporting U.S. currency from inside the United States to Mexico, the defendant relied on several other strategies to transport the commingled proceeds from the illegal gambling business and Club 7 out of the United States.

164.   The government's expert analyzed the bank records for the defendant's personal U.S. checking account, Mexican bank account with BBVA Bancomer, as well as bank accounts belonging to Dalaney and the defendant's current girlfriend, Shawnee Traughber.

165.   Traughber began dating the defendant in or about 2009.

166.   The defendant's personal account shows a pattern of large deposits, followed by a series of closely-spaced withdrawals in La Ventana or other towns near the Flying High Resort.

167.   These withdrawals are typically from ATMs and appear to equal the daily withdrawal limits for the account.

168.   All of the funds deposited and withdrawn from the defendant's personal account in this manner are traceable to the Club 7 business checking account, either through direct electronic transfers or checks. Gov't Ex. 7-33.

169.   In addition to withdrawals from his personal bank account in the United States, the defendant also had a Mexican bank account into which he deposited U.S. currency between 2006 and 2008.

170.   These deposits were often followed by counter withdrawals.

171.   Beginning in 2010, the bank accounts belonging to Dalaney and Traughber exhibit even more pronounced patterns of large deposits, followed by numerous withdrawals in Mexico.

172. The bank manager testified that the defendant was present when Traughber opened the account in her name; Traughber and the defendant stated that the account was so that money could be withdrawn in Mexico to pay the "contractor."

173. All of the deposits into the account in Traughber's name were cash and made by the defendant or Traughber.

174. Of the $40,977.79 deposited into this account in 2010, $37,690.61 was withdrawn in Mexico.

175. The same pattern is evident for the $13,100.00 deposited in 2011, of which $12,756.47 was withdrawn in Mexico. Gov't Ex. 7-15.

176. Traughber's federal income taxes and worker's compensation claim show that her only source of income in 2010 and 2011 was her job at Club 7.

177. The amount deposited, and then withdrawn, from this account greatly exceeded Traughber's annual salary and the amount claimed on her tax returns.

178. Dalaney graduated from high school in New Plymouth, Idaho, in the spring of 2010.

179. Since then, Dalaney has been living in Mexico, where he was assisting with efforts to finish and open the resort.

180. Beginning in March 2010, the Zions bank account in Dalaney's name exhibits a similar pattern of large deposits, followed by a series of withdrawals from

Mexican ATMs: Of the $26,000 deposited in 2010, $23,637.51 was withdrawn in Mexico.

181. Similarly, of the $6,000 deposited in 2011, $5,986.17 was withdrawn in Mexico. Gov't Ex. 7-19,

182. Employees at Zions bank stated that they recalled the defendant making several large cash deposits into the defendant's bank account in recent years.

183. During the years in question, Dalaney did not file a federal income tax return; neither former employees of Club 7 nor the bank employees recalled Dalaney working at a job that would have resulted in the type of cash deposits made in 2010 and 2011.

184. Even after Dalaney graduated from high school and began assisting with the Flying High Resort, the defendant remained the decision maker in practice and in fact – The defendant continued to personally finance construction of the Flying High Resort, which was done according to his plans and directions.

185. Even after the defendant was held for violating his conditions of release, prison calls show that he continued to oversee, manage, and direct the resort's operations.

186. As to the question of the money that went to Mexico and financed construction of the Flying High Resort, it all belonged to the defendant.

187. The evidence overwhelmingly shows that it was the commingled proceeds of Club 7 and the illegal gambling business.

188.    Since 2001, the defendant has had no other source of income, nor has he taken on any business partners for the Mexican property.

189.    Zitelli, who built a home on his property, testified that the preferred forms of payment in that area of Mexico have been cash and, only more recently, credit card.

190.    Just as importantly, in earlier years the preferred currency was U.S. dollars; in the last few years, business and works have asked for Mexican pesos.

191.    The defendant's method of transporting and transmitting funds to Mexico from the United States has reflected this changing preference – in earlier years, more of the money appeared to have been physically transported to Mexico as U.S. currency.

192.    In the last two years, the majority of the funds were withdrawn from ATMs in Mexico as Mexican pesos.

193.    The Court finds that one of the purposes of the money laundering conspiracy was the transportation, transmission, and transfer of illegal gambling proceeds from within the United States to Mexico, and that the purpose of the transportation, transmission, and transfers was to conceal and disguise the nature, location, ownership, and control of the illegal gambling proceeds, in violation of 18 U.S.C. § 1956(a)(2)(B)(i).

194.     Although the defendant in fact exercised control of the Mexican property and was using his money to finance the resort's construction, the property nonetheless remained in his minor son's name.

195.     In more recent years, the defendant opted to use the bank accounts of his son and girlfriend to transmit money to Mexico; to conceal and disguise possible connections to the commingled proceeds from Club 7 and his illegal gambling business, the deposits were generally cash, not wire or electronic transfers that would show the true source and nature of the funds being transmitted overseas.

196.     Because much of the money taken out of the country was personally carried across the United States-Mexico border and not declared, the defendant and his associates were further able to conceal the extent and location of the illegal proceeds.

197.     Because cash is difficult to trace, it is not possible to determine with mathematical certainty the exact amount of money the defendant and his associates transported from the United States into Mexico, or exactly how much of that cash was used in the construction of the Flying High Resort.

198.     While some of the cash that was ultimately transported from the United States to Mexico came from bank accounts that the defendant owned or controlled, some of the commingled cash proceeds taken across the border were never deposited into any bank account in the United States or Mexico.

199. Before being transported across the border, some cash was stored in a safe located in the defendant's personal residence above the bar.

200. Further, the defendant was known to personally carry money across the border and give money to his associates, including Youngblood, to carry.

201. The government's expert estimated that the money transferred and transported to Mexico between 2004 and 2011 was at least $342,170.01.

202. In so calculating, the government's expert only considered Youngblood's trips in 2007 and 2008, as documented by border crossings records.

203. This figure includes withdrawals from the Club 7 bank account, the defendant's personal account, the U.S. bank accounts in Dalaney and Traughber's names, and the Mexican bank account that the defendant had from 2006 to 2008. Gov't Ex. 7-36.

204. Immigration records show that the defendant made at least thirty-three trips to Mexico between 2004 and 2011.

205. Assuming that he also transported currency to Mexico on these trips, the total amount of currency transmitted to Mexico between 2004 and 2011 increases to $639,170.01. Gov't Ex. 7-37.

206. While higher, the evidence suggests that the $639,170.01 figure is not an unreasonable estimate, particularly given that it does not include any cash transported by the defendant's other associates, such as Petras, Traughber,

Dalaney, or Kelly Wren, despite evidence that others besides Youngblood assisted

with the transportation and oversight of the property during the period in question.

207.    The figure is also far lower than the total profits that the defendant is known to

have made from his illegal gambling business – $1,013,768.10.

### Factual Conclusions

208.    Based on the foregoing, the Court makes the following findings as to the personal

money judgment and real property sought to be forfeited.

### A.  Electronic Video Gambling Machines

209.    The electronic video gambling machines seized on or about June 15, 2011 were

personal property used by the defendant and his associates to carry out the illegal

gambling business, in violation of 18 U.S.C. § 1955.

210.    These machines were the games of chance that customers paid to play, and

received cash pay-outs on in violation of Idaho state law.

### B. Club 7

211.    Club 7 was used to commit, facilitate, and aid the defendant's illegal gambling

business and therefore has the requisite nexus to Count 5.

212.    The defendant directed his employees at Club 7 to assist customer use of the

electronic video gambling machines and make cash pay-outs.

213. Although he was required to stop serving alcohol at 2 a.m., the defendant nonetheless kept Club 7 open and staffed twenty-four hours a day, even during the graveyard shift when the bar could not serve alcohol.

214. What the bar could, and did, do during those hours was give customers access to the machines, which were in operation twenty-four hours a day.

215. Club 7 was clearly involved in the money laundering conspiracy and therefore has the requisite nexus to Count 6.

216. As discussed above, the financial transactions associated with ATM and check cashing services occurred at Club 7.

217. In the case of the check cashing service, Club 7 employees were the ones who exchanged the third-party checks for cash.

218. The EFTs and third-party checks were deposited into the Club 7 bank account, which in turn acted as the source and conduit for money that was subsequently transported from the United States to Mexico both directly via ATM withdrawals, and indirectly through counter withdrawals of U.S. currency that were then physically carried to Mexico or deposited into another account that the defendant owned or controlled.

### C. The Flying High Resort

219. The government seeks forfeiture of the Flying High Resort based on the defendant's guilty plea to Count Five and Count Six.

220.    The Court agrees that the requisite nexus has been shown as to both counts.

221.    As to Count 5, The Flying High Resort is real property that constitutes and is derived from the illegal gambling proceeds.

222.    Constructing the Flying High Resort is how the defendant spent at least part of his income between 2004 and 2011, which included profits from the illegal gambling business.

223.    For all the years at issue, the calculations by the defendant and IRS both show that the illegal gambling business, not Club 7's legitimate operations, was the primary source of the defendant's profits, and thus, disposable income.

224.    During the years in question, the witnesses unequivocally identified the defendant as the individual who controlled, managed, and financed The Flying High Resort.

225.    Given Dalaney's age, lack of income, and infrequent visits to Mexico, no one besides the defendant had the ability and financial means to undertake the scope or extent of work done on the property.

226.    As to Count Six, the Flying High Resort was not only "involved in" the money laundering conspiracy, but traceable to funds that were involved in the conspiracy.

227.    As set out above, the government has shown that the Flying High Resort was one of the means by which the defendant and his associates sought to conceal and disguise the nature, location, source and ownership of the illegal gambling proceeds.

228. While in fact financed by the defendant, the defendant placed his son's name on the title; he also used bank accounts in his son and girlfriend's name to transport the illegal proceeds to Mexico, where they were further distanced from the illegal gambling operation by being converted into a Mexican beachfront resort.

229. The funds used to construct the Flying High Resort all came from the commingled proceeds of the illegal gambling business and Club 7.

230. Some of these funds the defendant stored in his personal safe until personally transporting the funds, or asking one of his associates to do so.

231. In other instances, the funds used to construct the resort passed through the Club 7 bank account; these funds were deposited into the Club 7 bank account through the ATM and check cashing transactions, both of which were at the heart of the money laundering conspiracy.

### D. Personal Money Judgment

232. The government seeks personal money judgments against the defendant based on Count Five and Count Six.

233. The Court finds that the government has proved judgments in the following amounts by a preponderance of evidence and established the requisite nexus.

234. With respect to the defendant's conviction for illegal gambling, the government has shown that $1,397,699.50 was "used" in commission of the offense.

235.    This figure represents the amount that the defendant and his associates made in cash pay-outs to customers between mid-2003 and 2010.

236.    As with the other gambling calculations, this number is based on records obtained from the bar and defendant's personal residence at Club 7 during the search warrant.

237.    The meter readings from the gambling machines and gambling ledgers were interpreted with the assistance of the verbal explanation given by the defendant to the undercover agent.

238.    The government has also shown that the defendant personally made $1,013,768.10 in profits from his illegal gambling business.

239.    Accordingly, the total money judgment based on the illegal gambling business conviction is $2,411,467.60.

240.    In light of evidence that the defendant operated and profited from the illegal gambling business before mid-2003 and from January 2011 until June 2011, the money judgment associated with the defendant's gambling conviction is conservative; there is no question that additional monies were paid out between January and June 2011, or that the defendant profited from the illegal gambling business during that time.

241. As to Count 6, the government has shown that over $1,610,899.00 in U.S. currency was involved in the EFT fund transfers associated with the ATM transactions at Club 7.

242. All of these transactions involved commingled proceeds from Club 7 and the illegal gambling business.

243. The government has also shown that $3,074,159.24 in U.S. currency was involved in the check cashing transactions, in which third-party checks were exchanged for commingled proceeds.

244. Finally, the government's expert determined that $342,170.01 was transported from the United States to Mexico pursuant to the money laundering conspiracy.

245. The total personal money judgment is thus equal to $5,027,228.25.

## CONCLUSIONS OF LAW

1. Title 21, United States Code Section 853 and Federal Rule of Criminal Procedure 32.2 govern criminal forfeiture proceedings.

2. Here, the defendant pled guilty to conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and operating an illegal gambling business, in violation of 18 U.S.C.§ 1955.

3. Title 18, United States Code Section 982(a)(1) requires that the Court, "in imposing a sentence on a person convicted of an offense in violation of section 1956 . . . of this title, shall order that the person forfeit to the United States any

property, real or personal, involved in such offense, or any property traceable to such property."

4.      Similarly, 18 U.S.C. § 1955(d) provides for forfeiture of "[a]ny property, including money, used in violation of the provisions of this section."

5.      Further, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), a person convicted of § 1955, shall forfeit to the United States "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to [such] violation."

6.      In contrast to civil forfeiture proceedings, which are *in rem*, criminal forfeiture proceedings are *in personam*.

7.      A further difference is that criminal forfeiture is part of sentencing. *See, e.g., United States v. Ali*, 619 F.3d 713, 720 (7th Cir. 2010).

8.      The character of the forfeiture proceedings, and resultant order, matter because they implicate what the government must show, and the notice that must be provided to the defendant and to any third parties who might later seek to claim an interest in the property at issue.

9.      Criminal forfeiture requires that the government provide notice to the defendant that it intends to seek forfeiture. Rule 32.2(a).

10.     This notice must be included in the indictment or information.

11.     It is not necessary, however, to identify the property subject to forfeiture. *Id.*;

        *United States v. Liquidators of European Fed. Credit Bank*, 630 F.3d 1139, 1144-

        45 (9th Cir. 2011).

12.     The government satisfied the notice requirement in this case by including

        Forfeiture Allegations One and Two in the Superseding Indictment.

13.     Once notice has been given, if the defendant is then convicted or pleads guilty to a

        count supporting forfeiture, the government may then move for entry of a

        preliminary order of forfeiture. Rule 32.2(b).

14.     "As soon as practical after a verdict or finding of guilty . . . on any count in an

        indictment or information regarding which criminal forfeiture is sought, the court

        must determine what property is subject to forfeiture under the applicable statute."

        *Id.*

15.     If the government seeks a personal money judgment, the court "must determine

        the amount of money that the defendant will be ordered to pay."

16.     When the government seeks forfeiture of specific property, "the Court must

        determine whether the government has established the requisite nexus between the

        property and the offense." *Id.* (emphasis added).

17.     As to the property sought and the amount of any personal money judgment, the

        government is not limited to the amounts or victims alleged in the counts of

        conviction. *United States v. Pena*, 380 Fed. App'x 623, 627 (9th Cir. 2010).

18. The government must establish the forfeitability of property, and the amount of any personal money judgment, by a preponderance of the evidence. *United States v. Martin*, 662 F.3d 301, 307 (4th Cir. 2011).

19. A court may base its forfeiture determination on evidence already in the record, as well as any additional evidence or information submitted by the parties. Rule 32.2(b)(1)(B).

20. Because forfeiture is part of sentencing, the Rules of Evidence do not apply.

21. Accordingly, hearsay may be considered and relied upon, so long as it has sufficient indicia of reliability. *Ali*, 619 F.3d at 720; *United States v. Capoccia*, 503 F.3d 103, 109 (2d Cir. 2007).

22. Here, for both the illegal gambling business and money laundering conspiracy offenses, the government seeks a personal money judgment against the defendant and forfeiture of specific property.

23. Based on the defendant's guilty plea to Count Five, the United States seeks forfeiture of the following:

   a. Any property, real or personal, used in any manner or part to, to commit, facilitate, aid, or abet the offense. The property sought includes the electronic video gambling machines seized on or about July 15, 2011; the real property located at 210 SW 3rd Street in Fruitland, Idaho – Club 7 – out of which the illegal gambling

business operated; and a money judgment in an amount equal to the gambling pay-outs to customers.

b. Any property, real or personal, constituting or derived from any proceeds the defendant obtained, directly or indirectly, as a result of said offense. The property sought includes the real property currently known and doing business as The Flying High Resort in La Ventana, Baja California Sur, Mexico, which is alleged to constitute, or be derived from, the proceeds of the illegal gambling business. In addition to the Flying High Resort, the government seeks a money judgment in an amount equal to the profits that the defendant received from the illegal gambling business.

24.     Based on the defendant's guilty plea to Count Six, the United States seeks forfeiture of the following:

a. Any property, real or personal, involved in such offense. The property sought includes the real property known as Club 7, and the real property currently known and doing business as The Flying High Resort, both of which were involved in the money laundering conspiracy. The United States also seeks a money judgment in an amount equal to the funds involved in the money laundering conspiracy.

b. Any property, real or personal, traceable to such property that was involved in the money laundering conspiracy. In addition to seeking forfeiture of The Flying High Resort as a property "involved in" the money laundering conspiracy, the

government seeks forfeiture based on The Flying High Resort being traceable to property that was involved in the money laundering conspiracy, namely the profits and proceeds of the money laundering conspiracy.

25. Neither "involved in" nor "used in" is defined in the statute.

26. In *United States v. Cheesemen,* 600 F.3d 270 (3rd Cir. 2010), the Third Circuit indicated that these terms should be defined by using their ordinary and natural meanings.

27. The Third Circuit held that "involved in" in 18 U.S.C. 922(g)(3) had its plain meaning of "to engage as a participant"; "to relate closely"; "to have within or as part of itself" and "to require as a necessary accompaniment." *Id*. at 278.

28. In *Cheesemen*, the court explained that the firearms were "involved in" the offense that the defendant pled guilty to because "the firearms served as the foundation of his criminality and conviction"; "without the firearms, there would have been no crime."

29. The court therefore found that the firearms sought to be forfeited "were related closely to and were a necessary accompaniment to the crime charged in Count One." *Id*.

30. The court further held that "involved in" was not ambiguous or used in a way that would otherwise merit the rule of lenity.

31. "Involved in" has also been interpreted to include property that was itself being laundered, "as well as property used to facilitate a money laundering offense." *In re 650 Fifth Ave. and Related Properties*, 777 F. Supp. 2d 529, 562 (S.D.N.Y. 2011) (citing *United States v. Eleven Vehicles*, 836 F. Supp. 1147, 1153 (E.D. Pa. 1993) and collecting other cases from the Eleventh, Tenth, Ninth, and Fifth); see also *United States v. All Monies ($477,048.62) In Account No. 90-3617-3, Israel Discount Bank, New York, N.Y.*, 754 F Supp. 1467, 1473 (D. Hawaii 1991).

32. For example, property that was being laundered would include the illegal proceeds, as well as any legal source funds that were commingled by or through the financial transactions that were the basis of the laundering charges.

33. When the forfeiture theory is based on the property being "used to commit or facilitate the commission of a criminal offense," or being "involved in the commission of a criminal offense," the government must establish a "substantial connection between the property and the offense." *In re 650 Fifth Ave. and Related Properties*, 777 F. Supp. 2d at 562.

34. The legislative history similarly describes "involved in" as "intended to include the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense." 134 Cong. Record S17365 (daily ed. Nov. 10, 1988).

35.     "Facilitation," as defined by the Eighth Circuit, occurs when the property makes the prohibited conduct less difficult or more or less free from obstruction or hindrance. *United States v.Huber*, 404 F.3d 1047, 1060 (8th Cir. 2005).

36.     To determine forfeitability, the factfinder analyzes whether the instrumentalities sought to be forfeited, "including funds in some cases, . . . facilitate[d] (or promote[d]) the money-laundering transactions." *Id*. at 1061 (emphasis in original).

37.     In *United States v. Schlesinger*, the Second Circuit held that the defendant's legitimate clothing manufacturing business "facilitated" the laundering of his fraud proceeds because the defendant deposited proceeds from his insurance and creditor fraud into the business operating accounts of his clothing manufacturing company.

38.     The defendant then used commingled funds, which included illegal proceeds, to pay the clothing company's monthly lease and tax expenses.

39.     The Second Circuit held that the premises of the clothing manufacturer was forfeitable because "the premises served as a conduit for the proceeds of the illegal transactions." *United States v. Schlesinger*, 261Fed App'x 355, 360-61 (2d Cir. 2008).

40.     Forfeiture extends "to any other commingled funds that are part of the transaction." *Huber*, 404 F.3d at 1060 n.11.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 43**

41. In the case of the money laundering conspiracy, "if the legitimately obtained funds are part of a transaction that also involved proceeds of a specified unlawful activity, they are forfeitable as the corpus of the money-laundering offense; thus, there is no need to rely on the facilitation of section 982(a)(1).

42. But if the funds do not actually move in the transaction, then the facilitation theory could be invoked." *Id.*

43. The defendant is not the only person who may "own," or have a property interest in, the specific property that the government seeks to forfeit.

44. This other individual is not, and may not become, a party to the defendant's criminal case. 21 U.S.C. § 853(k)(1). He or she is what the forfeiture procedures and statutes call a "third party."

45. Because third parties cannot intervene in a criminal trial or appeal, the statutes and procedures that govern criminal forfeiture specifically instruct the factfinder not to consider whether any third party has an interest in the property sought to be forfeited when entering a preliminary order of forfeiture: "The court must enter the [preliminary order of forfeiture] without regard to any third party's interest in the property.

46. Determining whether a third party has such an interest must be deferred until any third party files a claim in an ancillary proceeding under Rule 32.2(c)." Rule 32.2(b)(2); *United States v. Lazarenko*, 476 F.3d F.3d 648, 642 (9th Cir. 2007)

("Upon a finding that the property involved is subject to forfeiture, a court must promptly enter a preliminary order of forfeiture without regard to a third party's interest in the property.")

47.     As the Ninth Circuit noted in *United States v. Lazarenko*, "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied, or broader words to define the scope of what was to be forfeited." *Id*. (citing *United States v. Monsanto*, 491 U.S. 600, 607 (1989).

48.     A determination of the property rights, if any, of third parties are left to separate, ancillary proceeding in which the defendant has no part. 18 U.S.C. § 853(n). Section 853(n) provides the process for a third party to vindicate any interests that the alleged third party in this case has in the forfeited property. See *Lazarenko*, 476 F.3d at 648; *United States v. Liquidators of European Fed. Credit Bank*, 630 F.3d 1139, 1145-46 (9th Cir. 2011).

49.     The Ninth Circuit has made clear that the ancillary proceeding is the only avenue for a third party to claim an interest in the seized property. *Lazarenko*, 476 F.3d at 648; see also *Libretti v. United States*, 516 U.S. 29, 44 (1995); *United States v. Nava*, 404 F.3d 1119, 1125 (9th Cir. 2005) ("We have held that third parties must await the defendant's conviction before filing proceedings to protect their interest in the property and must await the court's order of forfeiture before requesting an ancillary hearing.").

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 45**

50.    For that reason, in *United States v. Lazarenko*, the Ninth Circuit dismissed the appeal of a third party that sought to challenge a preliminary order of forfeiture against a defendant convicted of money laundering as an intervenor, rather than through the proscribed ancillary proceeding. 476 F.3d at 645, 652. In that case, as here, an issue arose during the criminal forfeiture proceedings as to whether a third party, Liquidators, was the owner, or had an ownership interest in, the assets subject to the preliminary order of forfeiture. *Id*. at 645-46.

51.    In dismissing the third party's appeal, the Ninth Circuit explained that an ancillary proceeding is the only avenue for challenging the preliminary order of forfeiture, and that the district court properly declined to adjudicate third party ownership interests in finding the entire property interests at issue forfeitable. *Id*. at 647-48.

52.    Because a third party must wait until after the criminal case has concluded, the criminal forfeiture proceedings necessarily make a complete determination as to the defendant and the property sought to be forfeited, without regard to the interest that may remain after any possible, but unconducted, ancillary proceeding.

53.    A corollary of the rule that a third party must wait to contest criminal forfeiture in an ancillary proceeding – and that the ancillary proceeding is the only means for claiming an interest in the forfeitable property – is that the defendant cannot delay or prevent forfeiture by arguing someone else owns the property sought to be forfeited.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 46**

54.     In other words, a defendant cannot shield himself from a preliminary order of

        forfeiture by raising the specter of a third party later showing up and claiming that

        he is the true owner of the property in a separate, ancillary proceeding in which the

        defendant is not a party.

55.     Thus, a defendant arguing that someone else owns the property sought to be

        forfeited is an improper attempt to litigate the interests of the absent third party,

        which is what § 853(k) and Rule 32.2 prohibit.

56.     Further, while the issue of "ownership" may ultimately determine how much the

        government recovers, it does not affect the inquiry at this juncture, the initial

        forfeiture determination.

57.     The question now before the Court is whether certain money or property should be

        found forfeitable.

58.     The statutes that authorize forfeiture in this case, § 982(a)(1), § 1955(d), and §

        2461(c) make no mention of "owners" or "ownership."

59.     Instead, these statutes direct the Court to order forfeiture of property "used in" the

        offense, "constitut[ing] or is derived from proceeds traceable" to the offense, or

        "involved in [the] offense, or any property traceable to such property."

60.     The question before this Court is thus "whether the government has established the

        requisite nexus between the property and the offense." Rule 32.2(b)(1)(A)

        (emphasis added).

61.    The nexus that the government must show depends on the statutory basis for forfeiture – that is how and why the small phrases like "involved in," "traceable to" and "used in" matter.

62.    This inquiry focuses on the relationship between the property at issue and the offenses committed by the defendant, not on whom else may someday claim to own or have an interest in the property.

63.    Mindful that the government's burden is to show a nexus between the crimes of conviction and the money and property it seeks to forfeit, the Court made the findings of fact explained above, as well as the ruling in the Court's contemporaneous Order.

DATED: November 29, 2012

B. Lynn Winmill
Chief Judge
United States District Court